21-1010 Estate of Tomas Beauford May it please the court, David Lane on behalf of the Estate of Tomas Beauford from the law firm of Kilmer, Lane & Newman. Your honors, I tell my lawyers that I supervise, don't get hyperbolic in appellate briefs or arguments, and I stand by those words. I've been doing this for 41 years, and I tell you that this is one of the most egregious injustices I've really ever seen in my career. I don't say that lightly, and I think that what we have here is a failure by the lower absolutely was completely helpless, and at the mercy of his captors, 100% of the time for the month and a half that he was in their custody. As you undoubtedly know from the briefs and from the record, Mr. Beauford functioned with had severe epilepsy to the point where he had a vagal nerve stimulator implanted in his body, and he had a bracelet that he was given, and even he understood that if he rubbed the bracelet across his chest, that would modify, mitigate, or stop seizures from occurring. That's about the limits of his understanding. He was coming from a regional center where he was housed because he was so severely intellectually disabled. He got rambunctious at the regional center. They called the police. The police took him to jail. This was not his first stint in the Mesa County Jail. They were familiar with him. They were familiar with his severe, profound disabilities. The issues set out in the lower court opinion are pretty stark, really. The court below draws a line in the sand in this case and says, it is not deliberate indifference to not forcibly medicate someone in Mr. Beauford's circumstance. Well, the line in the sand on these cases has been drawn by the Supreme Court, and it is pretty difficult to make out a deliberate indifference case, and you would have to show that it was clearly established with respect to forcible medication. I just don't think it's there. We don't have a case from this circuit or the Supreme Court where we have held or the Supreme Court has held that it's a violation of the Eighth Amendment to forcibly medicate someone. Can you point me to such authority? The cases we've cited from the Supreme Court generally talk about when forcible medication is appropriate. Normally, civil rights lawyers are, as the court below pointed out, on the other side of this issue. You can't forcibly medicate someone. I agree with Your Honor that there may be a slippery slope here, but on the polar extremes, it is very clear that there are some people you cannot forcibly medicate. If you are capable of making an informed decision and you choose not to take critical medications, the Supreme Court in Harper and other cases talks about, well, you can't medicate somebody who wants to give up their medications. But on the other extreme, we have Mr. Beauford, who is- Mr. Beauford arrived at the Mesa County Jail with an order that he had been previously forcibly medicated and had been previously found, I guess, incompetent, but maybe not in the legal sense. Could you speak to that order and its import in this case? Absolutely. It's not a binding order on the Mesa County Jail, and it's a little bit older than when he got to the Mesa County Jail, but it serves in this case, if nothing else, to completely red flag the issue for Mesa County. There was testimony in the court below that- in deposition testimony, that in 21 years, they've never forcibly medicated anyone at that jail, regardless of need. No one could be in more need of forcible medication than Mr. Beauford. That is- and your honor, Judge McHugh, you made the point, well, what's the case law on that? Well, the case law talks extensively about being deliberately indifferent to the serious medical needs of an inmate. Yes, and the Supreme Court has made it very clear, I just recently was told this again, that you can't look at cases at a high level of generality, and essentially, you have to have a case that is close enough on the facts that every reasonable officer in the prison would know that they are violating the inmate's Eighth Amendment rights by not doing or doing something. We've cited case law talking about when an inmate is having chest pains, this court has held, you have got to act, failing to act. There's extensive case law that we've cited in the briefs talking about all of the different things that- because so many different medical situations arise, you don't have to have such a level of particularity that all you're focused on is an individual tree and you've got to find an exact copy. It's not a bigger and better hunt or a treasure hunt for the same case. Here, we have an absolute clarity. Tomas Beauford, I asked- Let me interrupt. You have sued, individually, Nurse Havens, and one of your allegations is she didn't forcibly medicate him, okay? Every time Nurse Havens went to administer drugs to Mr. Beauford, he took the medication. How can there possibly be a claim against Nurse Havens for a violation of his Eighth Amendment and deliberate indifference based on failure to forcibly medicate when every interaction she had with him, he took his medication? Because these nurses were all acting together in concert. They were all part of- They would all look at the nursing notes. They all had the medication chart where they were writing down when he was taking his meds and when he was refusing his meds. She was as much on notice that he had refused meds 50% of the time. The fact that she was able to bribe him into taking meds the times that she gave him meds doesn't change the fact that she has an obligation to take care of his health, his serious medical needs. She saw that these were critical meds, which is a term of art, by the way. Dr. Holmes, in volume 22 of the appendix, I think if you want to see an overview of this case, Dr. Holmes provides the best one. Every one of these medical people was on notice that these are critical meds, and he defined critical meds as being essential for saving one's life. These are not aspirin when you have a headache. A critical med is an anti-epileptic med. This was labeled a critical med. They have a policy in place that when a critical med is refused three times, you have got to send this inmate to a psychological assessment. Mr. Lane, you say that the clearly established law for forced medication is the general law is that when someone is in dire need, you provide services, and that's what you rely upon. Yet before, you said that this forced medication issue is a slippery slope. Now, a slippery slope to me is not clearly established law, and it seems to me that this question of forced medication does not fit nicely into the generality of a requirement to provide services when somebody is in need, those general laws. I think you do need to give us some more specific law so that we can call it clearly established. Well, this court, SELOC, talks about forcible medication, deliberate indifference. The cases that we have cited- It says that it is a constitutional violation not to forcibly medicate. No, it doesn't say that. That's what we're looking for. Well, off the top of my head, I don't have the case site that I can give you, but I will try to come up with that. I'm going to reserve some time here for rebuttal. If you find a case that shows there's clearly established law on forcible medication, you can submit that in a 28-J letter, and you need not- Well, we can do that, but the point I'm making is it's a slippery slope in the middle. You don't want to see the system abusing people by saying, well, this guy needs to be forcibly medicated, so we're going to shoot him up with psychotropic drugs when he really doesn't need it. But it's not a slippery slope at the polar ends. There are people who absolutely clearly need to be forcibly medicated, and that's not a slippery slope. I mean, this is the quintessential case of deliberate indifference to the serious medical needs of an inmate. And people who are unconscious get forcibly medicated. If you find somebody lying on the street and an ambulance comes along, they can't give consent to being medicated, but they're medicated. Against their will, they've neither given consent nor opposed. Beaufort is in that circumstance. That is a routine thing that happens every day. Medical personnel forcibly medicate innumerable people. I would like to reserve the remaining four minutes of my time for rebuttal, if I may. You may. May it please the court, Jake Goldstein on behalf of the Pelley's, Nurse Havens, Nurse Workman, Nurse Shands, Nurse Keenan, Dr. Holmes, Mr. Lefebvre, and the CCS corporate defendants. I'll be spending our time with my co-defendant. The district court's order should be affirmed because the record evidence establishes that none of the medical defendants were deliberately indifferent to Mr. Beaufort's medical needs in any of the various ways alleged by plaintiffs. And I'd like to go directly to plaintiff's forcible medication claim against the nurses. And I think it's important to point out that there is no that Mr. Beaufort frequently refused his medications as much as 50% of the time. But there's also no dispute that he had a long history of doing so at his previous facility. And to address Judge Rossman's question about the order that was in place, there was no order compelling forcible medication with respect to his anti-epilepsy drugs. The order that was in place at the prior facility that was not continued during the period of time he was at the Mesa County facility related to only his anti-psychotropic drugs. And so I wanted to make that clear because I think it is important that these nurses and the doctors, they knew from his history at the prior facility that this gentleman had refused his drugs at least 50% of the time. And so they were confronted with the difficult situation of obviously trying to take care for a gentleman who oftentimes would refuse that care. And so the question of whether that rises to deliberate indifference really stems from the question that the court has posed, I think it was Judge McHugh who asked it, that really, is there any case law out there that establishes that it's clearly established that forcible medication would be required in this type of situation? And the district court hung its, really based its decision on this point that what plaintiff is really asking the court to enter here is to find that the forcible medication was constitutionally required under these circumstances. But what plaintiff is ignoring is that there were less intrusive, reasonable means of getting his compliance and taking these medications. And that evidence that came in was that they could try to bribe him that these nurses- And that was successful about half the time, right? And so, I mean, while I understand that forcible medication, there are no cases that say that's a constitutional violation, you do have Dr. Holmes, who has an obligation to be overseeing globally the care of Mr. Beauford. And he has reports from the nurses that he is refusing about 50% of the time. And the only way to know if he has therapeutic levels of his anti-psychotic, or no, not his anti-psychotic, his anti-seizure medication is to do a blood draw. And never do I see, there's no order from Dr. Holmes to do a blood draw to at least see whether he's likely to have more and more severe seizures. What about that? I mean, is that, I mean, we do have a case law that says, you know, I guess two points on that. The first point is that, you know, I think it's well established that the decision to go forward with additional testing falls within the medical judgment of a medical professional and does not, on its own, the failure to take that additional step establish deliberate indifference. Well, that's if they consider it and make a reasoned decision to do it or not to do it. My theory here is that he didn't consider it at all. Maybe wasn't even reviewing what the nurses were inputting. Well, there is evidence that he was considering all of these factors, Your Honor. And that the evidence is that there were weekly meetings, or if not more frequently between the nurses and Dr. Holmes and Mr. Lefebvre, where they went through, you know, Mr. Beaufort's, you know, refusal to take medications on occasion, his refusal to eat on occasion. And the Dr. Holmes was satisfied with the plan that was in place in terms of trying to compel that compliance with the medication and the food and so forth. With respect to the blood draws, that was something that plaintiff's expert, Nurse Roscoe, talked about as well. And she explained that they can still get an idea of what the levels are in the blood based on their known history of the amount of medications that he has taken. That she can do a calculation, apparently, that can tell her what is likely to be the levels. And on autopsy, they did find that his levels, with the exception of one of the drugs, were within normal limits and where they were expected to be. So they found in the autopsy that he had therapeutic levels of the epilepsy drug? For some of them, yes. Yes, one of them was below... You mean there are multiple epilepsy drugs? Correct. And Mr. Beaufort would oftentimes choose which ones he would agree to take and which ones he would refuse. And so... What about the miscommunication or, I mean, this is somebody who really shouldn't have been in this institution. I mean, this institution really isn't able to give someone of Mr. Beaufort's unique vulnerabilities the care that he needs. And there seemed to be... Dr. Holmes seemed to think that there was a transfer being looked into or in the process, and yet that wasn't actually true. Well, Dr. Holmes understood that Mr. Lefebvre was looking into transferring because they believed that his long-term benefit would be greater at a facility that was more specially designed to treat these conditions and behaviors. Now, Mr. Lefebvre testified that it was a consideration, but he was not actively looking into it because he did not see an acute need to do that. And so in his medical judgment, having assessed Mr. Beaufort, I believe it was at least six times over the six weeks he was there, he never observed him to be manic, never observed him to be paranoid. He never observed him to be hearing voices or hallucinating, never observed him to be suicidal. And he was taking his medications at least 50% of the time. And so based on these facts, Mr. Lefebvre didn't believe in his medical judgment or professional judgment that there was a need to transfer him. And ultimately what that really does raise is not a question of deliberate indifference, but it's a question of medical negligence and whether that was the correct decision to take at that point. And so it's clear that this isn't a case like many of the cases plaintiff cites in his brief where you have the medical defendants in those cases ignoring, I believe counsel referred to an inmate's complaints of chest pain. There was no complaints with respect to- Well, there weren't affirmative complaints. There was the absence of the ability to say anything. I mean, he had oppositional defiant disorder. And so he wasn't able to say yes. So I'm just not sure I understand how medical providers in Dr. Holmes' position wouldn't be constitutionally required to take some sort of action here, especially in light of the fact that they were on the one hand dealing with an individual who had come into the system who had been previously forcibly medicated, which is unique. And on the other hand, believing that treats would be sufficient to get this individual to take his meds. And I just don't understand how both can be true and support your position. Well, I think the reason why the doctor acted the way he did in making that decision is because he was relying on the reports from his nurses and his nurses were telling him that he does respond to our attempts to get him to comply with his medications. He doesn't do it every time, but he does it at least 50% of the time. And so Dr. Holmes and Mr. Lefebvre knew from that information and acted based on that information that he was still receiving enough medication and that there was no acute need for a transfer to another facility. And so we have to judge their actions based on the knowledge that they had at that time. And the knowledge that they had at that time was based on their reports from the nurses who all consistently testified to the fact that Mr. Beaufort did understand what he was doing when he was refusing these drugs. He did understand the importance of these drugs because they would tell him and he would then take them when they would tell him that it's a danger for him. Mr. Goldstein, I don't want to cut you off, but if you fully answered it, I see Mr. Klaus is very nervously looking at you. Yes, I'd like to turn this over to Mr. Klaus and stand on the brief for the rest of the meeting. Did you fully answer Judge Rossman's question? I hope I did. Okay, thank you. All right, thank you, Your Honors. May it please the Court, Andrew Klaus for the government defendants. You know, as I sit here and listen to this, both in terms of the questioning and in terms of the presentations by counsel, it really strikes me that everything we're talking about here is really negligence. And to respond to Mr. Lane's initial comment that this was one of the worst orders from the district judge that he's ever seen, I disagree. I think Judge Domenico got it right. Every, you know, we talk about the blood drug. That's negligence. That's not deliberate indifference. That does not meet the subjective test. So at the most, the crux of this case is really that this is a medical malpractice case. It is not a deliberate indifference case. We talk about qualified immunity on it. Mr. Klaus, let me ask you specifically about the corrections officer, Dalrymple. Yes. And his failure to act right around, I think, 11, 11 o'clock, 12 o'clock, and he failed to act and just went on about different business and then came back and it was too late. Correct, Your Honor. So first of all, it happened. That feels like deliberate indifference. Well, let me respond to that. So first of all, it happened at midnight. The policy at the jail is that all of the deputies make their rounds every 30 minutes. That was done here. On his 12 o'clock round, he came to Mr. Beaufort's cell. He looked in. Mr. Beaufort was lying on the floor with his head on the desk like he often does. This is someone who has epilepsy. There's testimony in the record, although it's, I don't know if it made it to this. But my understanding of the evidence was when Dalrymple looked at him at that point, Dalrymple recognized it was a little different than he had observed him before. That's not correct, Your Honor. He actually looked in. First time he could see his chest moving. Second time when he saw him on the floor, he said he couldn't tell if he was breathing. That's a difference. Correct. So the first time, which was midnight, he's doing his normal round. He looks in and he sees him lying on the floor, as he is often known to do. He checks with his flashlight to see if he's breathing. He is. He moves on. He does not form the subjective mindset. We're talking about the 12, 15 a.m. incident. So in his post-incident statement, Officer Dalrymple says he couldn't tell for sure if Mr. Beaufort was breathing or not. And then later in his deposition, he said he did think that Mr. Beaufort was breathing when he used his flashlight and so forth. How does that not create some sort of tension in what actually happened in this situation? Well, I think we're talking about, again, I think we're mistaking the two different instances. The first instance is at midnight. That's when he checks with the flashlight, sees the breathing. He then goes back to his officer station and decides, out of the abundance of caution, knowing that there had been a seizure this night, he goes back, not on his regular 12, 15, but before that at roughly 12, 15. At that point, that is when he's not sure, and that's when he calls medical. He doesn't call immediately, though, does he? He finishes his rounds. No, I think he does. He goes on his radio. He finishes his rounds, and then medical comes. I think that's what the record establishes. Wait a minute. Does he get on his radio as he is completed finishing? My understanding is when he sees the testimony that I understand is that when he sees this at 12, 15 and he's not sure, he calls medical. No. I have the record right in front of me. He completed his rounds, and he contacted the nursing staff at 12, 25 a.m. Okay. My to the officer station, and maybe he didn't use his radio, and he calls it in. Medical then comes. It's then that medical determines that there's an issue, and the code one is called. But what is pointed out is that there was a 10-minute gap when he saw a serious problem. It was different than the problem before, and 10 minutes passed before he does anything about it. Yeah, and my position is that when he sees that, he does go back. He does not. He has the option to call a code one right on his radio. He doesn't because he's not sure. So what he does is he goes and says to medical, hey, can you come in here and check? I'm not sure, and I don't have the record exactly in front of me, but I think there's conflict. Let me tell you. When he hesitated, he observes this at 12, 15, and he hesitates because he's not sure, and he deliberately determines not to call at that time, and can't you infer that he's indifferent? We know that he's deliberate. Isn't he indifferent? Well, he doesn't realize then, Your Honor, that there is a serious medical need. He thinks there could be a need, which is why he then goes back and calls. Had he seen blood coming out or something that would tell him that there was clearly an issue, he could have and would have used his radio. But isn't the issue whether Mr. Beaufort was breathing? It's subtle, but it's important. Yes, but he wasn't sure if he was breathing, so he wanted to have medical come and further check. So your position is it's not deliberate indifference unless he knew he wasn't breathing and then waited 10 minutes. If he just wasn't sure whether he was breathing or not breathing, it was perfectly fine to wait 10 minutes. Well, I think under the law, under the subjective standard, he has to make an informed decision that there is a serious medical need. He doesn't know. He's already coming back voluntarily before his rounds. He comes to look. He does see the change. He decides, I'm not sure I'm going to call medical, but he does not form the subjective decision that anything is seriously wrong or that he's dying or that he needs medical attention. Instead, he says, I'm going to be extra safe and go get medical. OK, and you're over your time, so OK. Thank you. And Mr. Lane, I think you have some time left. And you have four minutes. I'm going to take it up to five because they went over. Thank you, Your Honor. Well, Mr. McNulty, who argued Denver homeless out loud a few minutes ago, saved me again. We're going to not have to go down the rabbit hole of qualified immunity because this is a private medical provider. CCS doesn't get qualified immunity. We don't need a case directly on point from the 10th Circuit or the U.S. Supreme Court. And this court in Tanner versus McMurray in March of this year decided that they don't get qualified immunity. And it was a CCS case, the same exact defendants that we have here. This court in Tanner versus McMurray said no qualified immunity doesn't apply to a private health care provider. And it also doesn't apply to the counties for Monell purposes. So we are. We've solved that problem. Well, are you raising that for the first time right now? No, it's on page 66 of our brief footnote 12. And CCS has waived it because they didn't argue qualified immunity in their briefing. And I suppose they didn't argue it because this court in March smacked them down in Tanner versus McMurray. So that issue is is not before this court. And it's not relevant to this case. The only people who may get qualified immunity are the judge Murphy has hit the nail on the head in context of, you know, Dalrymple for sure. I mean, they're looking at a man on the floor. He wasn't sleeping with his head on the desk, like Mr. Klaus argued. He was under the desk. And they somehow want everybody to believe, oh, that's normal. People just sleep on the floor of their cells under their desks. They were all on notice. The record is replete with references to all of them understanding Mr. Beauford's severe limitations intellectually. And what the court below continually says is offering him access to meds was sufficient. And that proves that they were not deliberately indifferent. And our point in this appeal is, no, offering a five year old access to what a rational human would believe to be lifesaving meds is not enough. It's like telling if I asked various people in depositions, would you let a five year old cross a busy street by himself? And the answer was no. What do you say? Mr. Goldstein tells us that the autopsy indicates that there were sufficient therapeutic levels of the epilepsy drug. Is that not so? No, that is not so. And it says exactly the opposite. There were not therapeutic levels of drugs in his blood system. Specifically of the epilepsy drug? Yes. He had non-therapeutic levels. And they argued below that, well, these drugs may or may not have therapeutic levels. We'll look at the autopsy and say it's one way or the other. And Dr. Spitz, one of our experts, also said, no, there was not a therapeutic level. He is a neurologist. He's the guy who put the VNS in Mr. Beauford's body. He said more importantly than taking away the bracelet for the VNS, the most important consideration is that he did not have therapeutic level of non-epileptic drugs in his system to have been active. And merely offering him the opportunity to take meds when he clearly doesn't understand why that's necessary is the equivalent of allowing a five year old to, giving them instructions on how to cross a busy street without a traffic light. You wouldn't do it. And the other issue that I want to briefly talk about is... Can I ask you one thing? Do you point to fault on both behalf of the medical defendants and the county defendants? I do. No, specifically the one aspect of failure to transfer him to a different facility. Lefebvre and Holmes claimed that they were trying to do that, but there is a non-delegable duty on behalf of the county. They can't simply escape liability by saying, well, hey, we gave it to the medical people, so we're off the hook. And that's also cited in our brief. There's an extensive discussion about that. Is there evidence about the issue being passed back and forth? Well, the deputies were very well aware that they were ill-equipped to handle someone with Mr. Beauford's medical needs and psychiatric needs. And that's why Holmes and they had discussed this with the medical people. That's why the medical people allegedly were trying to transfer him somewhere. So from the county perspective, is that a realm where they should rely upon the recommendation from the medical people? And so if there's fault, it falls on the medical people for not recommending a transfer? Well, both Holmes and Lefebvre say, well, we were trying to transfer him, but the security people, the jail deputies, are the ones that have the actual ability to do that. Holmes testified, I can't transfer people. All I can do is make recommendations to the security staff, and they did nothing. So, yeah. Okay. I understand. Any further questions? Thank you. We will take this matter under advisement.